OPINION *Page 2 
{¶ 1} Defendant-Appellant Dennis R. Brock ("Brock") appeals the August 20, 2007 Judgment Entry of the Court of Common Pleas of Hancock County, Ohio sentencing him to life in prison for each of thirteen counts of Rape, in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree to be served consecutively. In total, Brock was sentenced to thirteen consecutive life terms. Brock was also classified as a sexual predator.
 {¶ 2} This matter stems from events occurring in June of 2004 at the home Brock shared with his wife, Eva Charlene Brock ("Charlene") in Rawson, Ohio. On June 8, 2004, Brock and Charlene's son, Eric Brock ("Eric") and his five year-old daughter, Lizzy, were visiting in Rawson, Ohio. Eric, his wife, and Lizzy reside in Minnesota.
 {¶ 3} On June 10, 2004 Eric returned to Minnesota, leaving Lizzy to spend a week or two with her grandparents. Charlene was primarily responsible for the care of her granddaughter during her visit. On June 11, 2004 Charlene was tired from poor sleep the prior night and keeping up with five-year old Lizzy all day. Charlene asked Brock if he would watch Lizzy while she took a nap. Brock agreed. *Page 3 
 {¶ 4} When Charlene woke up from her nap, she gave Lizzy a craft project to work on to occupy her. Charlene alternated between preparing dinner and checking on Lizzy.
 {¶ 5} While Lizzy was working on her craft project, Charlene asked her what Lizzy and Brock had done while Charlene napped. Lizzy stated that they had played games. Lizzy then stated that "grandpa looked at my privates." (Tr.p. 383). Charlene then asked Lizzy if she understood what "privates" meant and Lizzy stated that "it's where you pee and you poop." Id.
 {¶ 6} Charlene was disturbed by this information and asked Lizzy if she was sure about what she was telling Charlene. Lizzy responded that she was sure and that "he licked me like a dog. That's yucky." Id. Lizzy also stated that Brock "stuck things up [her] butt." Charlene inquired as to what those things were and Lizzy described a screwdriver, mini flashlight, and other tools contained in Brock's workshop.
 {¶ 7} After hearing Lizzy's statements, Charlene quickly arranged to return Lizzy to her parents in Minnesota. Upon returning Lizzy, Charlene stayed with Eric's family in Minnesota for four months before returning to Ohio. When Charlene returned to Rawson, Ohio she sought counseling. *Page 4 
 {¶ 8} In counseling, Charlene discussed the abuse. Charlene's counselor subsequently reported the abuse to the Hancock County Sheriff's Office.[1] Based on this report, Detective Timothy Graydon from the Hancock County Sheriffs Office went to the Brock residence and interviewed Charlene on April 18, 2005. After Detective Graydon finished speaking with Charlene, Brock arrived home. Detective Graydon asked Brock if they could speak in private. Brock then took Detective Graydon out to his workshop behind the house.
 {¶ 9} Brock stated that he assumed Detective Graydon was there to discuss what happened ten months ago with Lizzy. Detective Graydon then explained Brock's Miranda rights to him using a form. Brock read the rights aloud, indicated that he understood those rights and signed aMiranda waiver. Brock then proceeded to give a full account of what occurred on June 11, 2004 when he was alone with Lizzy, detailing abuse that was consistent with Lizzy's explanation of the events. During the interview, Brock also showed Detective Graydon the bedroom in the house where the abuse occurred. After interviewing Brock, Detective Graydon made the decision to arrest him.
 {¶ 10} On October 4, 2005, Brock was indicted by the Hancock County Grand Jury on thirteen counts of Rape in violation of R.C. 2907.02(A)(1)(b), each *Page 5 
a felony of the first degree. Each count also contained a penalty specification as to the victim's age, indicating that the victim was less than ten years of age.
 {¶ 11} On October 5, 2005, Brock entered pleas of not guilty by reason of insanity to all counts of the indictment and requested a competency evaluation. On October 27, 2005, the trial court held a hearing to review the competency evaluation submitted by Dr. Thomas G. Sherman of the Court Diagnostic and Treatment Center. The trial court found Brock competent to stand trial.
 {¶ 12} On December 8, 2005, Brock filed a motion to suppress evidence. Specifically, Brock contends that his oral confession should have been suppressed. Brock also filed numerous pre-trial motions concerning the admissibility of various evidence, including a motion to prevent the State from introducing certain out of court statements made by Lizzy.
 {¶ 13} The State subsequently responded to the motions. On January 26, 2006 and February 21, 2006, evidentiary hearings were held for the court to hear evidence to decide Brock's motions.
 {¶ 14} On February 16, 2006, the trial court issued a written opinion on Brock's motion to suppress finding that Brock had waived his Miranda rights before confessing to the detective. The court also found that no custodial interrogation occurred in this case. On March 13, 2006 the trial court ruled on *Page 6 
Brock's various motions. Included in the March 13, 2006 Entry was a finding that Lizzy's out of court statements were admissible.
 {¶ 15} On April 10, 2006, Brock entered a plea of no contest to all thirteen counts of the indictment. The trial court found Brock guilty and continued the matter for sentencing. The case came before the trial court for sentencing on May 9, 2006. Brock was classified as a Sexual Predator and sentenced to four consecutive life sentences.
 {¶ 16} Brock subsequently attempted to appeal his convictions and sentence, apparently under the mistaken belief that the trial court's pre-trial rulings were appealable. This Court found substantial evidence in the record to support the contention that Brock's no contest plea was entered upon the mistaken belief of both counsel and the trial court that pre-trial rulings would be appealable. However, this Court found that only the denial of Brock's motion to suppress was appealable and that all other pre-trial motions in limine were not appealable after Brock entered a no contest plea. Therefore, this Court vacated the judgment of the trial court and remanded for further proceedings.State v. Brock, 3rd Dist. No. 5-06-27, 2006-Ohio-6681.
 {¶ 17} After the case was remanded, the first pre-trial was held on January 11, 2007. On February 9, 2007 Brock again requested a competency evaluation and entered a plea of not guilty by reason of insanity. We also note that Brock *Page 7 
again filed a number of motions in limine during the pre-trial period. In an Entry issued August 3, 2007 the trial court noted that all pre-trial motions had been previously resolved in the March 13, 2006 Entry. The trial court incorporated those findings into its August 3, 2007 Entry.
 {¶ 18} A jury trial was held from August 13-15, 2007. On August 15, 2007 the jury found Brock guilty of all thirteen counts of Rape. On August 20, 2007 Brock was sentenced to thirteen consecutive terms of life in prison, one for each count of Rape, for a total of thirteen consecutive life terms. Brock was also labeled a sexual predator.
 {¶ 19} Brock now appeals asserting four assignments of error.
 ASSIGNMENT OF ERROR I BROCK'S CONSTITUTIONAL RIGHT AGAINST SELF-INCRIMINATION WAS VIOLATED BECAUSE ANY INCRIMINATING STATEMENTS GIVEN TO
 AUTHORITIES SHOULD HAVE BEEN SUPPRESSED. ASSIGNMENT OF ERROR II BROCK'S CONSTITUTIONAL RIGHTS PURSUANT TO THE CONFRONTATION CLAUSE WERE VIOLATED BY THE TRIAL COURT'S DECISION THAT STATEMENTS MADE BY BROCK'S GRANDDAUGHTER TO HER GRANDMOTHER WERE ADMISSIBLE, AND THE STATEMENTS WERE LIKEWISE INADMISSIBLE UNDER EVID. R. 807 BECAUSE THE TRIAL COURT DID NOT MAKE THE NECESSARY PREREQUISITE FINDINGS.
 ASSIGNMENT OF ERROR III THE TRIAL COURT ERRED BY FAILING TO GRANT BROCK'S RULE 29 MOTION BECAUSE THE STATE DID NOT PROVIDE COMPETENT EVIDENCE TO PROVE *Page 8 EACH COUNT BEYOND A REASONABLE DOUBT, AND HIS RIGHT TO DUE PROCESS WAS OTHERWISE VIOLATED.
 ASSIGNMENT OF ERROR IV LETTERS SENT BY DENNIS BROCK TO HIS WIFE SHOULD NOT HAVE BEEN ADMITTED BECAUSE THEY WERE PROTECTED BY SPOUSAL PRIVILEGE, AND WERE NOT VOLUNTARILY PRODUCED.
 First Assignment of Error {¶ 20} In his first assignment of error, Brock argues that the trial court erred in overruling his motion to suppress. When a trial court considers a motion to suppress, it must make both factual and legal determinations. State v. Jones, 9th Dist. No. 20810, 2002-Ohio-1109 citing Ornelas v. U.S . (1996), 517 U.S. 690, 699, 116 S.Ct. 1657,134 L.Ed.2d 911, 920. Moreover, when we review a trial court's decision that evidence arising out of a challenged seizure should not be suppressed we apply the law, de novo, to the facts as determined by the trial court.Id. At a suppression hearing, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. State v.Carter (1995), 72 Ohio St.3d 545, 552, 651 N.E.2d 965, 1995-Ohio-104;State v. Mills (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Furthermore, when reviewing a trial court's decision on a motion to suppress, an appellate court must uphold the trial court's findings of fact if they are supported by competent, credible evidence. State v.Dunlap (1995), *Page 9 73 Ohio St.3d 308, 314, 652 N.E.2d 988, 1995-Ohio-243. We must defer to "the trial court's findings of fact and rely on its ability to evaluate the credibility of witnesses[,]" and then independently review whether the trial court applied the correct legal standard. State v. Anderson
(1995), 100 Ohio App.3d 688, 691, 654 N.E.2d 1034.
 {¶ 21} Prior to addressing the merits of Brock's first assignment of error, we note that the State is prohibited from using any statements made by a defendant, whether exculpatory or inculpatory, during a custodial interrogation unless proper Miranda warnings have been given.State v. Andrews, 3rd Dist. No. 1-05-70, 2006-Ohio-3764 citingMiranda v. Arizona (1966), 384 U.S. 436, 444, 86 S.Ct. 1602,16 L.Ed.2d 694; see also State v. Mason (1998), 82 Ohio St.3d 144, 153,694 N.E.2d 932, 1998-Ohio-370. A person is considered in custody for purposes ofMiranda when he is placed under formal arrest or his freedom of action is restrained to a degree associated with a formal arrest.Andrews, supra at ¶ 19 citing State v. Simpson, 10th Dist. No. 01AP-757, 2002-Ohio-3717 (citing Minnesota v. Murphy (1984), 465 U.S. 420, 434,104 S.Ct. 1136, 79 L.Ed.2d 409). "In judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a `reasonable person would have believed that he was not free to leave.'" State v. Gumm (1995), 73 Ohio St.3d 413, 429,653 N.E.2d 253, 1995-Ohio-24. In contrast, general on-the-scene questioning as *Page 10 
to facts surrounding a crime or other general questioning of citizens in the fact-finding process ordinarily does not constitute a custodial interrogation. Miranda, 384 U.S. at 477.
 {¶ 22} Moreover, in ruling on a motion to suppress a confession, a court must determine whether statements made by a defendant were coerced. In determining whether a defendant's confession was involuntarily induced, the court should consider the totality of the circumstances. State v. Greeno, 3rd Dist. No. 13-02-46, 2003-Ohio-3687 at ¶ 21 citing State v. Bays (1999), 87 Ohio St.3d 15, 22,716 N.E.2d 1126, 1999-Ohio-216. Circumstances to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.Bays, 87 Ohio St.3d at 22; see also State v. Edwards (1976),49 Ohio St.2d 31, 358 N.E.2d 1051 at syllabus (vacated on other grounds);Mason, 82 Ohio St.3d at 154.
 {¶ 23} We note that the Supreme Court of Ohio has determined that "[t]he use of an `inherently coercive tactic' during interrogation is a prerequisite to a finding of involuntariness. Such tactics include,e.g., physical abuse, threats, or deprivation of food, medical treatment, or sleep." State v. Cooey (1989), 46 Ohio St.3d 20, 28,544 N.E.2d 895. "[T]he question of voluntariness is a question of law. Consequently, an appellate court must arrive at its own conclusion as to *Page 11 
whether a given confession was voluntary by reviewing the facts of the case." Greeno, supra at ¶ 21 citing State v. Weeks, 3rd Dist. No. 8-2000-07, 2000-Ohio-1928, quoting State v. Jett (Mar. 31, 1998), Portage App. No. 97-P-0023.
 {¶ 24} In the present case, Brock filed his motion to suppress on December 8, 2005, contending that his Miranda rights were not knowingly, intelligently, and voluntarily waived. We note, however, that in his motion to suppress, Brock alleged no specific reasons for why his confession was not knowingly, intelligently, and voluntarily given. Brock argued only a general violation of the requirements articulated inMiranda.
 {¶ 25} The trial court held a suppression hearing on January 26, 2006 in which Detective Timothy A. Graydon detailed the circumstances surrounding Brock's confession. Detective Graydon testified that he was contacted by an employee of the St. Louis County, Minnesota Human Services Department regarding the possible sexual abuse of Lizzy by Brock. The employee indicated that Lizzy had disclosed the abuse to Charlene, whose counselor then reported the abuse to the authorities in Hancock County. After the report was made to Hancock County, St. Louis County officials were contacted to interview Lizzy. After Lizzy recounted the abuse, the case was sent back the Hancock County Sheriffs Office for investigation. It was this investigation that prompted Detective Graydon to go to the home in Rawson, Ohio to speak with Charlene. *Page 12 
 {¶ 26} When Detective Graydon arrived at the home, Brock was out of the home working and Detective Graydon was able to interview Charlene in private. Charlene told Detective Graydon that Brock probably would not return until the evening. However, Brock returned home just as Detective Graydon was completing his interview of Charlene.
 {¶ 27} Detective Graydon then completed his discussion with Charlene and approached Brock, inquiring if there was someplace where they could speak privately. Brock then lead Detective Graydon out to his workshop behind the house. Upon entering the workshop, Brock stated that he knew that Detective Graydon was at the house because of what happened ten months ago with Lizzy.
 {¶ 28} Detective Graydon then gave Brock a Miranda rights waiver form and determined whether Brock understood the form; asking him if he read and understood English and inquiring about his level of education. Brock stated that he had his high school diploma and had completed over two years of college. Brock read the form aloud and indicated that he understood the form. After indicating that he did not have any questions about the rights he was waiving, Brock signed the form.
 {¶ 29} After the Miranda form was completed, Detective Graydon interviewed Brock who subsequently detailed the events that occurred in June 2004. Detective Graydon testified at trial that the interview was very relaxed and *Page 13 
conversational. The interview began in the workshop but then progressed into the house as Brock detailed where the abuse took place. Charlene brought Brock a beverage during the course of the interview, which was the only interruption that occurred.
 {¶ 30} Nothing alleged in Brock's original motion to suppress or in his brief indicates any specific allegation of coercion. This is bolstered by Detective Graydon's testimony that Brock was very compliant, never became angry, and was very conversational in completing the interview.
 {¶ 31} In ruling on the motion to suppress the trial court found as follows:
 Deputy Graydon interviewed the defendant's wife, Charlene Brock, at the Brock residence at 205 West Vance Street, Rawson, Ohio on April 18, 2005. During this interview, the defendant, Dennis Brock, arrived home and was interviewed by Deputy Graydon. After a volunteered response to preliminary questions, Graydon advised the defendant of his Miranda rights (Suppression Hr'g Ex. 1). The defendant read the rights waiver aloud, said he had no questions, understood the form, signed the form, and agreed to talk to Deputy Graydon. The oral interview of the defendant was followed by a written statement provided by the defendant. The Court finds compliance with Miranda v. Arizona (1966), 384 U.S. 436. In addition, no custodial interrogation occurred in this case. The State has demonstrated by a preponderance of the evidence a knowing, intelligent, and voluntary waiver by the defendant based upon the totality of the circumstances surrounding the contact between the defendant and Deputy Graydon on April 18, 2005. See Colorado v. Connelly (1986), 479 U.S. 157; Lego v. Twomay (1972), 404 U.S. 477; and State v. Brewer (1990), 48 Ohio St.3d 50, 549 N.E.2d 491.
Judgment Entry, February 16, 2006. *Page 14 
 {¶ 32} We first note that Brock's interview occurred both in his workshop and in his home. Nothing Detective Graydon communicated during the interview appears to have indicated to Brock that he was not free to leave during the course of the interview, or to terminate the interview. Moreover, Brock was not placed under arrest until the conclusion of the interview, with the decision to arrest occurring at the conclusion of the interview. Detective Graydon testified that he had no plans to arrest Brock when he went to the residence, as he did not even expect Brock to be home.
 {¶ 33} Additionally, nothing in the record before this Court, in the allegations contained in the original motion to suppress, or in Brock's brief indicate that Brock did not fully understand the rights he was waiving. Brock, who has a high school degree and over two years of college education, indicated that he understood the form, and was, moreover, speaking with Detective Graydon in his own home of his own free will.
 {¶ 34} Finally, we note that nothing done by Detective Graydon to encourage Brock to be forthcoming during the interview rose to the level of coercion. Detective Graydon admitted that he gave Brock a speech about honesty and stated that he would make a favorable recommendation to the prosecutors if Brock was honest. However, Graydon made no specific promises or representations. Therefore, we cannot find that Brock's waiver was anything other *Page 15 
than knowing, intelligent, and voluntary. Accordingly, Brock's first assignment of error is overruled.
 Second Assignment of Error {¶ 35} In his second assignment of error, Brock argues that his Confrontation Clause rights were violated when the trial court allowed Charlene to testify to the statements Lizzy made to her describing the abuse. Moreover, Brock argues that the trial court erred in misapplying Evid. R. 807 to find this testimony admissible.
 {¶ 36} As an initial matter we note that decisions regarding the admissibility of evidence are within the sound discretion of the trial court and will not be reversed absent a showing of an abuse of discretion. State v. Yohey (March 18, 1996), 3d Dist. No. 9-95-46, citing State v. Graham (1979), 58 Ohio St.2d 350, 390 N.E.2d 805 andState v. Lundy (1987), 41 Ohio App.3d 163. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 37} The Sixth Amendment provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." Sixth Amendment to the United States Constitution; State v. Stahl, 111 Ohio St.3d 186, 189,855 N.E.2d 834, 2006-Ohio-5482. *Page 16 
 {¶ 38} In Crawford v. Washington (2004), 541 U.S. 36, 68,124 S.Ct. 1354, 158 L.Ed.2d 177, the United States Supreme Court held that "[w]here testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross examination." The United States Supreme Court did not define the term "testimonial," but instead gave examples including: "all ex-parte in-court testimony or its functional equivalent, extrajudicial statements contained in formalized testimonial materials" (e.g., affidavits, depositions, prior testimony, confessions); and a class of statements that are made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." State v. Muttart, 116 Ohio St.3d 5,17, 875 N.E.2d 944, 2007-Ohio-5267, citing Stahl, 111 Ohio St.3d at 191, quoting Crawford, 541 U.S. at 51-52.
 {¶ 39} The Muttart Court recognized that "`[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . and as would an approach that exempted such statements from Confrontation Clause scrutiny all together.'" Stahl,111 Ohio St.3d at 190 quoting Crawford, 541 U.S. at 68; see also Davis v. Washington
(2006), 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224. "In fact, in the wake of Davis there is a significant question about whether the Confrontation *Page 17 
Clause analysis applies to nontestimonial statements." Muttart,116 Ohio St.3d at 17.
 {¶ 40} The United States Supreme Court, in Davis, found that with respect to testimonial statements, "[o]nly statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."Davis, 547 U.S. at 821 (internal citations omitted).
 {¶ 41} In the case sub judice, the statements in question were made by Lizzy to her Grandmother Charlene immediately after the abuse occurred. At trial, Charlene testified as follows:
 She said grandpa looked at my privates. And my first reaction was I said, oh, he did not. And she said uh-huh. * * * And so she said that he looked at her privates. She said it several times. And I said, Lizzy, do you know what that means? And she said yes. And I said, what does privates mean to you? And she says, It's where you pee and you poop. Very matter of factly. And I said, are you sure. She said yes. * * * She said yes, and he licked me like a dog. That's yucky.
(Tr.p. 383). After Charlene composed herself after the initial discloser from Lizzy, she again asked Lizzy if she was sure of what happened. Charlene testified that Lizzy told her as follows:
 And she said again, that he licked her like a dog. And then she said that — she said he stuck things up my butt too. And I asked her what kind of things, and she said a flashlight, a *Page 18 screwdriver, all instruments. I said instruments? And she said, yeah, she said things he's got out in the shop.
(Tr.p. 384).
 {¶ 42} We cannot find that Lizzy's statements to Charlene were testimonial in nature as these statements do not meet the test for testimonial statements as articulated in Crawford. They are not "ex parte in-court testimony or its functional equivalent," "extrajudicial statements contained in formalized testimonial materials," or statements that are made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford, 541 U.S. at 51-52. Lizzy's statements to her Grandmother Charlene were just that, statements of a child to her grandmother describing her time spent with her grandfather.
 {¶ 43} This Court has previously held that when a child discloses abuse to a family member, those statements are not testimonial in nature. See State v. Osborne, 3rd Dist. No. 1-06-94,2007-Ohio-5776. In Osborne, a case strikingly similar to the present case, the child-victim disclosed the sexual abuse to her Grandmother while she was using the restroom. This Court specifically held that "[t]he child-victim's statements to her grandmother were not made under a circumstance indicating to the child-victim that the statement would be used in a trial." Osborne, 2007-Ohio-5776, at ¶ 18. The Ohio Supreme Court reached a *Page 19 
similar result in Muttart, where the court determined that the victim's statements to her mother were non-testimonial. 116 Ohio St.3d 5, 17.
 {¶ 44} Having determined that Lizzy's statements were not testimonial in nature, we turn to their admissibility as hearsay statements. Brock argues that no hearsay exception is available to allow the admission of these statements. Hearsay is defined by Evid. R. 801(C) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 802 provides that hearsay statements are inadmissible at trial if no exception to the rule applies.
 {¶ 45} Evidence Rule 807 specifically governs the hearsay exception for statement made by a child in abuse cases. Evid. R. 807 provides:
 (A) An out-of-court statement made by a child who is under twelve years of age at the time of trial or hearing describing any sexual act performed by, with, or on the child or describing any act of physical violence directed against the child is not excluded as hearsay under Evid. R. 802 if all of the following apply:
 (1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid. R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement, the mental state of the child, the *Page 20 child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In making this determination, the court shall not consider whether there is independent proof of the sexual act or act of physical violence.
 (2) The child's testimony is not reasonably obtainable by the proponent of the statement.
 (3) There is independent proof of the sexual act or act of physical violence.
 (4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.
 (B) The child's testimony is "not reasonably obtainable by the proponent of the statement" under division (A)(2) of this rule only if one or more of the following apply:
 * * *
 (2) The court finds all of the following:
 (a) the child is absent from the trial or hearing;
 (b) the proponent of the statement has been unable to procure the child's attendance or testimony by process or other reasonable means despite a good faith effort to do so;
 (c) it is probable that the proponent would be unable to procure the child's testimony or attendance if the trial or hearing were delayed for a reasonable time.
 * * *
 (C) The court shall make the findings required by this rule on the basis of a hearing conducted outside the presence of the jury *Page 21 and shall make findings of fact, on the record, as to the bases for its ruling.
 {¶ 46} We first note that on February 23, 2007 Brock moved for the trial court to conduct a competency evaluation of Lizzy pursuant to Evid. R. 601. The trial court expressly found in its Entry of August 3, 2007 that Lizzy's statements fell within the purview of Evid. R. 807 because she was under twelve years of age at the time of trial and that the statement concerned acts of sexual conduct committed on the victim declarant.
 {¶ 47} Although not expressly required by Evid. R. 807, the Ohio Supreme Court has held that prior to admitting evidence under Evid. R. 807, the trial court must make a finding that the victim would be competent to testify as required by Evid. R. 601. State v. Said,71 Ohio St.3d 473, 644 N.E.2d 337, 1994-Ohio-402. In the present case, the trial court examined an interview conducted of Lizzy in Minnesota.
 {¶ 48} When the abuse was originally reported, Investigator Andrew Mickus of the Duluth, Minnesota Police Department conducted an interview of Lizzy. Investigator Mickus began the interview by asking Lizzy to spell her name and her age. Lizzy was able to correctly spell her name and correctly stated that she was five and a half years old. After inquiring as to Lizzy's age, Investigator Mickus then asked her what color the paper was. Lizzy correctly answered that the *Page 22 
paper was white. Investigator Mickus then asked her what it would be if he said the paper was purple. Lizzy responded that would be a lie.
 {¶ 49} Lizzy was instructed that it was ok to tell him when she did not know the answer to a question. Investigator Mickus asked Lizzy what color her house was. She told him. He then asked what color his house was. Lizzy stated that she did not know. Lizzy was also able to correct the Investigator when, several minutes later, he incorrectly stated her age as six, reminding him that she is five.
 {¶ 50} The Ohio Supreme Court specifically addressed the competency requirements of Evid. R. 601 in State v. Frazier (1991),61 Ohio St.3d 247, 250-51, 574 N.E.2d 483. Specifically, the court noted that
 It is the duty of the trial judge to conduct a voir dire examination of a child under ten years of age to determine the child's competency to testify. Such determination of competency is within the sound discretion of the trial judge. The trial judge has the opportunity to observe the child's appearance, his or her manner of responding to the questions, general demeanor and any indicia of ability to relate the facts accurately and truthfully. Thus, the responsibility of the trial judge is to determine through questioning whether the child of tender years is capable of receiving just impressions of facts and events and to accurately relate them. See State v. Wilson (1952), 156 Ohio St. 525, 46 O.O. 437, 103 N.E.2d 552.
Frazier, 61 Ohio St.3d at 250-251.
 {¶ 51} Moreover, the court articulated five factors a trial court is to consider in determining the competency of a child under ten years of age including: *Page 23 
 (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful.
Id.
 {¶ 52} In Lizzy's interview, Investigator Mickus determined that Lizzy understood the difference between the truth and a lie, and that if she did not know an answer to something, it was important to state that she did not know. Additionally, Investigator Mickus determined that Lizzy would correct misstatements. In the video tape of Lizzy's interview, the trial court could observe her correcting the Investigator when he misstated things.
 {¶ 53} Through observing the video taped interview of Lizzy, the trial court found that Lizzy was competent under Evid. R. 601. We note that the determination of whether a child is competent to testify rests within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. State v. Clark (1994),71 Ohio St.3d 466, 469, 644 N.E.2d 331. Therefore, we cannot find that the trial court abused its discretion in determining that Lizzy was competent.
 {¶ 54} Turning to each of the requirements of Evid. R. 807(A)(1), on March 16, 2007 the State of Ohio filed a Motion pursuant to Rule 807 that it intended to use the following information at trial: *Page 24 
 [Lizzy's] statements to her grandmother, Eva Charlene Brock, on June 11, 2004, at approximately 7:00 p.m. when [Lizzy] made the statement to her grandmother that "Grandpa looked at my privates" and "he licked me like a dog. It was yucky."
 {¶ 55} The trial court, in its August 3, 2007 Entry expressly considered the remaining requirements of Evid. R. 807(A)(1) wherein the trial court found that, with respect to whether Lizzy's statements contained the requisite guarantees of trustworthiness:
 Addressing the required considerations, this statement was spontaneous and internally consistent, at least as reported by Ms. Brock, in that it was not prompted by Ms. Brock, and did not contradict itself. (Evid. Hearing 2/21/06). Additionally, the testimony at the evidentiary hearing shows a rational victim, who was not overcome by emotion which would undermine the veracity of the statement. There did not appear to be a motive for the victim to fabricate, based on any family strife or outside influences, and she did not use any unexpected terminology — instead she used terms such as "yucky." (Id.) Lastly, the statement was made in her grandmother's living room, and was made shortly after the alleged incidents. (Id.) Thus, the Court finds that the statement to Ms. Brock contains the requisite guarantees of trustworthiness.
Nothing in the record before this Court contradicts the trial court findings and analysis leading to the conclusion that Lizzy's statements contained the requisite guarantees of trustworthiness.
 {¶ 56} Moreover, the trial court found that Lizzy's testimony was not reasonably obtainable. As an initial matter with respect to Lizzy's unavailability, we note that Brock never challenged the State's representations before the trial *Page 25 
court stating that Lizzy was unavailable. The State described Lizzy's unavailability as follows:
 As a matter of fact based upon our discussions with family members, it's my understanding that the father who lives in Minnesota with the child victim has indicated that he will not be bringing the child back nor [is he] wanting the child to go through testifying in this particular case.
(Tr.p. 9 Hearing on Motions January 26, 2006).
 {¶ 57} As previously noted, Brock made numerous challenges to Lizzy's competency to testify, but never objected to her classification as unavailable. Because no objection was made at trial, we find that Brock waived an objection to Lizzy's unavailability on appeal, and that, moreover, any review by this court would be reviewed under a plain error standard. The Ohio Supreme Court, in Barnes, articulated a three part test for the finding of plain error.
 First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be "plain" within the meaning of Crim. R. 52(B), an error must be an "obvious" defect in the trial proceedings. Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial.
Barnes, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, 2002-Ohio-68 (internal citations omitted).
 {¶ 58} Thus, "[o]nly extraordinary circumstances and the prevention of a miscarriage of justice warrant a finding of plain error." State v.Brown, 3rd Dist. *Page 26 
No. 8-02-09, 2002-Ohio-4755 citing State v. Long (1978),53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph three of the syllabus.
 {¶ 59} The trial court found that Lizzy was unavailable because "the child is outside the scope of compulsory process for the court, as she resides in Minnesota, as well as the fact that her father refuses to bring her within the jurisdiction of the court for the purposes of testifying." Entry August 3, 2007. We cannot find plain error in this determination.
 {¶ 60} Finally, the trial court determined that there was sufficient independent proof of the sexual acts to allow Lizzy's testimony to be introduced under Evid. R. 807. Prior to the August 3, 2007 ruling of the trial court, the court had denied Brock's motion to suppress and found his confession admissible. Moreover, the additional statements made by Brock prior to his interview with Detective Graydon contribute to the Rule 807 requirement. Additionally, Lizzy made statements when interviewed in Minnesota and Charlene made statements concerning the abuse to her counselor. The trial court found that this was sufficient independent proof of the sexual act. We agree. See In re: Pryor, 5th Dist. No. 02COA037, 2003-Ohio-2988.
 {¶ 61} Therefore, we find that Lizzy's statements to Charlene were excepted from the hearsay rule pursuant to Evid. R. 807. Because Lizzy's statements were not testimonial and were excepted from the hearsay rule under Evid. R. 807, we *Page 27 
cannot find that the trial court abused its discretion when it allowed Charlene Brock to testify regarding Lizzy's statements to her. Accordingly, Brock's second assignment of error is overruled.
 Third Assignment of Error {¶ 62} In his third assignment of error, Brock argues that the trial court erred by failing to grant his Crim. R. 29 motion for acquittal. Specifically, Brock appears to argue that the State failed to provide competent credible evidence as to each of the thirteen counts of Rape. Moreover, he argues that the charges were not supported by anything other than hearsay evidence.
 {¶ 63} Crim. R. 29(A) provides:
 The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.
 {¶ 64} A trial court should not grant a Crim. R. 29 motion for acquittal if "reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt * * *." State v. Bridgeman (1978), 55 Ohio St.2d 261,263, 381 N.E.2d 184. However, this Court has previously held that theBridgeman standard "must be viewed in light of the sufficiency of evidence test put forth in State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus." State v. Foster (Sept. 17, 1997), *Page 28 
3rd Dist. No. 13-97-09. Thus, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Jenks,61 Ohio St.3d 259 at paragraph two of the syllabus.
 {¶ 65} We first turn to the sufficiency of the thirteen separate charges of Rape as contained in the indictment. As an initial matter, we note that Brock did not object to the alleged lack of specificity in the indictment. Where a defendant fails to object to the form of the indictment before trial as required by Crim. R. 12(C), he waives all but plain error. State v. Frazier (1995), 73 Ohio St.3d 323, 332,652 N.E.2d 1000, 1995-Ohio-235; State v. Skatzes, 104 Ohio St.3d 195,819 N.E.2d 215, 2004-Ohio-6391.[2]
 {¶ 66} Pursuant to Crim. R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." State v. Barnes (2002), 94 Ohio St.3d 21, 27,759 N.E.2d 1240, 2002-Ohio-68. The Ohio Supreme Court, inBarnes, articulated a three part test for the finding of plain error.
 First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be "plain" within the meaning of Crim. R. 52(B), an error must be an "obvious" defect in the trial proceedings. Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule *Page 29 to mean that the trial court's error must have affected the outcome of the trial.
Barnes, 94 Ohio St.3d at 27 (internal citations omitted).
 {¶ 67} Thus, "[o]nly extraordinary circumstances and the prevention of a miscarriage of justice warrant a finding of plain error." State v.Brown, 3rd Dist. No. 8-02-09, 2002-Ohio-4755 citing State v. Long
(1978), 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph three of the syllabus.
 {¶ 68} Brock relies upon Valentine v. Konteh (6th Cir. 2005), 395 F.3d 626 to support his contention that the thirteen counts of Rape were not separate and distinct enough as to compose thirteen separate counts. However, Brock's reliance on Valentine is misplaced. InValentine, the defendant was convicted of twenty counts of Rape based on twenty separate indictments using the same charging language occurring in the same multiple month time period. No effort was made inValentine to distinguish the counts so that the defendant could defend against each incident separately, nor did the separate counts give any indication that they were for separate incidences. Instead, inValentine, the victim merely speculated as to the number of separate instances of abuse.
 {¶ 69} In the present case, the first count of the indictment against Brock read as follows:[3] *Page 30 
 The Jurors of the Grand Jury of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about the 11th day of June, 2004, at Union Township, Hancock County, Ohio Dennis R. Brock did engage in sexual conduct to wit: Cunnilingus, with another, one [Lizzy], having a date of birth of March 29, 1999, and not the spouse of the said Dennis R. Brock, the foresaid [Lizzy] being less than thirteen (13) years of age.
 {¶ 70} Count two of the indictment against Brock provided as follows:
 The Jurors of the Grand Jury of the State of Ohio, within and for the body of the county aforesaid, on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about the 11th day of June, 2004, at Union Township, Hancock County, Ohio Dennis R. Brock did engage in sexual conduct to wit: without privilege to do so the said Dennis R. Brock inserted his tongue into the anal cavity of another, one [Lizzy], having a date of birth of March 29, 1999, and not the spouse of the said Dennis R. Brock, the foresaid [Lizzy] being less than thirteen (13) years of age.
Each subsequent count differs from count two in that it details another object that Brock inserted into the anal cavity of his granddaughter on June 11, 2004.
 {¶ 71} This case is factually distinguishable from Valentine in that the indictment describes the date of the offense as well as exactly what occurred to constitute the offense. Moreover, the State presented testimony detailing each event. In his confession to Detective Graydon, Brock pointed out each item that he inserted into Lizzy's anal cavity. Detective Graydon collected each of those items and introduced them at trial. Moreover, Brock's journal described some of the *Page 31 
items he used on Lizzy. Finally, Lizzy herself articulated some of the multiple items Brock inserted into her anal cavity.
 {¶ 72} This testimony varies greatly from Valentine where the victim detailed the general abuse and estimated the number of times the abuse occurred. Therefore we find that the indictment was proper and alleged sufficient facts as to allow Brock notice of each allegation against him. See State v. Yaacov, 8th Dist. No. 86674,2006-Ohio-5321.
 {¶ 73} Brock also appears to argue, more generally, that the trial court erred in denying Brock's Crim. R. 29 motion because no rational trier of fact could have found the elements of the offense beyond a reasonable doubt. Rape is defined by R.C. 2907.02(A)(1)(b) as follows:
 (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
 * * *
 (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
 {¶ 74} At trial, the jury heard the testimony of Charlene Brock, as detailed in the previous assignment of error, indicating that Lizzy had told her about the abuse, specifically that Brock has engaged in cunnilingus with her and inserted objects into Lizzy's anal cavity. *Page 32 
 {¶ 75} The jury also heard passages from Brock's own journal detailing the abuse. Specifically the following passage was read into the record:
 I've been all right for 20 years. If only Charlene would have been excited enough to get up and do what she had talked about. I did not initiate anything, but I sure wasn't strong enough to say no and to stop. I know that it is not Charlene's fault, but if she would have been excited about her granddaughter to play with her, I could have gone and got things done and bypassed the temptation, or it would have never been brought up in the first place. I very possibly will not be writing here again. I don't see much for me here. What is new about that. And I suspect I might be prosecuted.
(Tr.p. 399).
 {¶ 76} The jury further heard the testimony of Dr. Mary Goebel-Komala, Charlene's counselor who initially reported the abuse. Finally, the jury heard the testimony of Detective Graydon who conducted the interview of Brock. Specifically, Detective Graydon detailed for the jury some of the information communicated by Brock during his confession.
 A: Dennis said that Charlene had asked him to watch Lizzy so that she could rest . . . [Lizzy] asked if they could play doctor. He said the next thing he knew she was up on the bed with her pants and underwear down, and she wanted instruments shoved up her butt . . . I asked what these items were. He said pens, plural. Pencils, plural, and he said anything and everything that was in the room. I asked what he did, and he said he took these instruments and he touched her butt hole with them.
(Tr.p. 454-455). *Page 33 
 {¶ 77} Brock then stated that he and Lizzy left the bedroom and went to his workshop, where he confessed to further abuse, stating:
 A:. . . Lizzy wanted to have sex again. And she jumped up on the workbench and next thing he knew her pants and underwear were down. She was on her hands and knees. She wanted an item shoved up her butt again.
(Tr.p. 456). Detective Graydon testified that Brock then showed him what items in the workshop he used on Lizzy, which were taken into evidence and introduced at trial. (Tr.p. 457).
 {¶ 78} Moreover, Brock further confessed to committing other sexual acts with Lizzy. Detective Grayson testified that Brock confessed to the following:
 A: He said that out in the shop also that he used his tongue to lick Lizzy's butt hole. And he said he had done that. After he beg[a]n licking her she wanted the other tools. Just want him to continue using his tongue. He told me that she then moved over on the bench. With her legs wide she asked that he also lick in the front area. I asked what he meant by that. He said the slit in front of the hole. Hole up the pee hole.
(Tr.p. 462).
 {¶ 79} Sufficient evidence was presented at trial such that a rational trier of fact could have found the essential elements of Rape proven beyond a reasonable doubt. Therefore, Brocks third assignment of error is overruled.
 Fourth Assignment of Error {¶ 80} In his fourth assignment of error, Brock argues that letters he sent to Charlene should not have been admitted into evidence because they were protected *Page 34 
by spousal privilege. Specifically, the State subpoenaed the letters, in the present case, which Brock argues amounts to the violation of spousal privilege.
 {¶ 81} R.C. 2945.42 provides the statutory definition of spousal privilege in Ohio, providing:
 Husband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness
 {¶ 82} When the trial court determined that letters written by Brock to Charlene while he was incarcerated were not covered by spousal privilege, it relied on State v. Howard (1990), 62 Ohio App. 3d 910. InHoward, the court specifically held that "Ohio's spousal privilege statutes protect oral communications with one's spouse intended to be private, but do not protect written communications with one's spouse, even though it is reasonably expected that the communication will remain confidential." 62 Ohio App. 3d 910, at syllabus.[4]
 {¶ 83} We also note that this Court has previously held that where spouses are separated and not living in coverture at the time spousal communications *Page 35 
occurred, spousal privilege will not apply. State v. Shaffer (September 16, 1996), 3rd Dist. No. 6-95-23. Charlene testified that her divorce from Brock was finalized in August of 2005. Brock was arrested on April 18, 2005. The letters introduced at trial were dated May 23, 2005, May 29, 2005, June 7, 2005, and June 24, 2005.
 {¶ 84} It is clear from the record before this court that Charlene and Brock were not living in coverture when the letters were sent. Brock was arrested on April 18, 2005 and has remained incarcerated to this day. Moreover, Charlene indicated at prior hearings that she sought counseling because she was having trouble staying in the marriage, knowing what Brock had done. (Tr.p. 54 Hearing on Motions 2/21/2006).
 {¶ 85} In this case, we are inclined to agree with the Second District Court of Appeal's holding, in Howard, supra, finding that written communications are not protected by the spousal privilege statute. Moreover, even if we were to find in the alternative, in the present case, we believe these written communications would not be protected by spousal privilege due to the impending divorce of Brock and Charlene.
 {¶ 86} Moreover, even if we were to find that spousal privilege was applicable, the admission of these letters would amount to nothing more than harmless error. "A reviewing court may overlook an error where the admissible evidence demonstrates overwhelming proof of defendant's guilt." State v. Williams *Page 36 
(1988), 38 Ohio St.3d 346, 351. Nothing contained in these letters written by Brock was not already provided to the jury in Brock's journal entries or in the testimony of other witnesses. Accordingly, Brock's fourth assignment of error is overruled.
 {¶ 87} Based on the foregoing, the August 20, 2007 Judgment Entry of the Court of Common Pleas of Hancock County, Ohio sentencing Brock to life in prison for each of thirteen counts of Rape, in violation of R.C. 2907.02(A)(1)(b) is affirmed.
Judgment Affirmed.
 WILLAMOWSKI, J., concur.
[1] Under Ohio law Charlene's counselor was a mandatory reporter of child abuse.
[2] We note that these cases were decided under a prior version of Crim. R. 12, citing specifically to Crim. R. 12(B)(2). However Crim. R. 12(C)(2) now contains a substantially similar provision.
[3] This count and each subsequent count contained a penalty specification indicating that the victim was less than ten (10) years of age.
[4] We note that the Howard court briefly concerned itself with whether spousal testimony was used to authenticate the written communication at issue. In Howard, the spouse's testimony was not used to authenticate the defendant's handwriting. In the case sub judice, Charlene did testify that she recognized Brock's handwriting. However, Brock's daughter, Michelle Shariff also testified and authenticated Brock's handwriting and gave additional information concerning who the letters were written to.